DECHERT LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
H. Jeffrey Schwartz (HJS-4105)
Gary J. Mennitt (GM-1141)
Elise Scherr Frejka (ESF-6896)
Jonathan D. Perry (JP-0863)

*Attorneys for the Debtors and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| BAYOU GROUP, LLC, et al., | : | Case No.: 06-22306 (ASH) |
| Debtors. | : | Jointly Administered |
| BAYOU ACCREDITED FUND, LLC, | : | Adv. Proc. No.: 06-08318 (ASH) |
| Plaintiff, | : | |
| -against- | : | |
| REDWOOD GROWTH PARTNERS, L.P., | : | |
| Defendant. | : | |

**<u>AMENDED COMPLAINT</u>**

Bayou Accredited Fund, LLC ("Bayou Accredited," "Plaintiff," or "Debtor"), by and through its counsel, Dechert LLP, as and for its Amended Complaint against Redwood Growth Partners, L.P. ("Redwood" or "Defendant"), respectfully alleges as follows:

## Nature of the Adversary Proceeding

1. On May 30, 2006, Bayou Group, LLC ("Bayou Group"), Bayou Management, LLC, ("Bayou Management"), Bayou Advisors, LLC ("Bayou Advisors"), Bayou Equities, LLC ("Bayou Equities"), Bayou Fund, LLC ("Bayou Fund"), Bayou Superfund, LLC ("Bayou Superfund"), Bayou No Leverage Fund, LLC ("Bayou No Leverage"), Bayou Affiliates Fund, LLC ("Bayou Affiliates"), and Bayou Accredited (together with Bayou Fund, Bayou Superfund, Bayou No Leverage, and Bayou Affiliates, the "Bayou Hedge Funds") (collectively, the "Bayou Entities") filed with this Court separate voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2. This adversary proceeding arises from a massive Ponzi scheme perpetrated by the Bayou Entities, which are an affiliated group of entities that created, operated, comprised, and controlled private pooled investment funds (commonly known as "hedge funds"). During the course of this fraud, the Bayou Entities attracted more than $450 million in investments for their hedge funds, the Bayou Hedge Funds. After suffering millions of dollars in trading losses, the Bayou Entities attempted to stay afloat, and indeed prolonged the scheme, by disclosing false investment performance and creating false financial statements. The Bayou Entities also attempted to conceal their losses through a series of fraudulent transfers to certain of their investor creditors, including the Defendant. In essence, the Bayou Entities used their depleted capital and capital from new investors to pay redemption proceeds to investor creditors seeking to exit the Bayou Hedge Funds. These redemption proceeds were paid based on inflated statements of what the investments were worth and with fraudulent intent by the transferors,

2

*i.e.*, the Bayou Entities. Ultimately, the Bayou Entities' Ponzi scheme collapsed, with approximately $250 million in principal unpaid to hundreds of creditors. Plaintiff seeks the return of the principal and fictitious investment gains fraudulently transferred to redeeming investors so that the funds can be equitably redistributed pro-rata to all of the Bayou Entities' creditors.

3. Plaintiff now brings this adversary proceeding pursuant to §§ 105(a), 502(d), 544(b), 548(a), 550(a), 551, and 1107 of the Bankruptcy Code, New York Debtor and Creditor Law §§ 273, 274, 275, 276, 276-a, and 278, and other applicable law, to set aside and recover certain fraudulent transfers made by Plaintiff to the Defendant and preserve said property for the benefit of Plaintiff's bankruptcy estate. Moreover, pursuant to § 502(d) of the Bankruptcy Code, Plaintiff seeks to disallow any claims filed by the Defendant against the Debtor or any of the other Bayou Entities unless and until the Defendant returns to the Debtor the transfers which are the subject of this Amended Complaint.

## Jurisdiction and Venue

4. This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334(b) of the subject matter of this proceeding because the claims asserted herein arise under Chapter 11 of the Bankruptcy Code and are related to a case pending under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "Bankruptcy Court").

5. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157 because this adversary proceeding arises in or under the Debtor's Chapter 11 case. Regardless of whether this is a core proceeding, consent is hereby given to the entry of final orders and judgment by the Bankruptcy Court. Defendant is notified that Rule 7008(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") requires it to plead whether this

proceeding is core or non-core and, if non-core, whether consent is given to the entry of final orders and judgment by the Bankruptcy Court.

6. Pursuant to 28 U.S.C. § 1409(a), venue of this adversary proceeding in the Bankruptcy Court is proper because the Debtor's case is pending in this district and division.

**The Parties**

7. Bayou Accredited is a Delaware limited liability company and one of the Bayou Hedge Funds.

8. Pursuant to an Order of the United States District Court for the Southern District of New York (the "District Court") entered on April 28, 2006, Jeff J. Marwil ("Marwil") succeeded to be the sole and exclusive managing member and authorized representative of each of the Bayou Entities. Thus, Plaintiff has a principal place of business located at Marwil's offices, c/o One IBM Plaza, Chicago, Illinois 60611.

9. Upon information and belief, Redwood has a place of business at 6075 Poplar Avenue, Suite 700, Memphis, Tennessee 38119.

**The Bayou Entities' Fraudulent Scheme**

10. The Bayou Entities operated their hedge funds as a fraudulent Ponzi scheme, and engaged in a series of fraudulent actions and transactions in furtherance of their criminal scheme. Samuel Israel III ("Israel") and Daniel E. Marino ("Marino"), who directed and controlled the business of the Bayou Entities from their inception through at least August 2005, both have pleaded guilty in this District to federal counts of mail and wire fraud, investment advisor fraud, and conspiracy to commit fraud relating to their operation of the Bayou Hedge Funds. The United States Securities and Exchange Commission and the Commodity Futures Trading Commission also have commenced separate enforcement actions against the Bayou Entities, Israel, Marino, and others, alleging violations of numerous laws and regulations.

11. The Bayou Fund – the first Bayou Hedge Fund created– was launched by Israel and Marino in 1996 with $1.2 million in capital. The Bayou Fund was a single-manager hedge fund marketed to "accredited investors" and large institutions.

12. Within months after the Bayou Fund opened and started trading, it sustained heavy trading losses. In 1997 and 1998, the Bayou Fund lost tens of millions of dollars.

13. In order to conceal those losses, the Bayou Entities began falsifying their financial disclosures and fraudulently misrepresenting their investment performances. In financial summaries that were sent to clients, the volatile swings of the trading gains and losses were concealed by padding and fabricating the results through a pattern of fraud.

14. As Israel and Marino both admitted in their respective plea allocutions, they and their co-conspirators:

> caused to be mailed quarterly reports to investors that contained fictitious rates of return on trading in the funds and annual financial statements that contained fictitious rates of return on trading and inflated net asset[] values. [They] also had faxed and mailed weekly newsletters that also misrepresented the performance of the funds at various times during the time period set forth in the information. All these communications to investors [] made it appear that Bayou was earning profits on trading when in fact it was not.

Israel further admitted that this false financial information concerning Bayou's performance was disseminated to "current and prospective clients of Bayou" in order to "induce [] people to invest in Bayou or continue to keep their money in Bayou."

15. The Bayou Fund's mounting losses could not withstand an independent audit of the year-end 1998 financial results. To avoid detection, the Bayou Fund's independent auditor, Grant Thornton LLP, was terminated. In its place, Marino, a certified public accountant, created a fictitious accounting firm – Richmond-Fairfield Associates, CPA, PLLC ("Richmond-Fairfield") – to pose as the independent auditor. The Bayou Fund was Richmond-Fairfield's

5

only client, and Marino was its only principal. Public records show that Richmond-Fairfield was formed by filing with the New York Department of State on October 10, 2000, long after it was presented to investors as the Bayou Fund's "independent" auditor.

16. Beginning in 1999 and continuing through at least 2005, Israel and Marino caused the Bayou Entities, under cover of purported "audits" by Richmond-Fairfield, to continue to generate false performance summaries and false financial statements designed to mislead investors. Because the Bayou Hedge Funds were self-administered and lacked a truly independent auditor, they were able to, and did, maintain books and records that fraudulently misrepresented their true financial performance.

17. From 1999 to 2003, the Bayou Fund continued to lose substantial amounts of money and never earned a profit. During a reorganization in February 2003, the Bayou Fund was liquidated and four separate on-shore hedge funds were created: Bayou Accredited, Bayou Affiliates, Bayou No Leverage, and Bayou Superfund. Investors were able to transfer their investment in the Bayou Fund to one of the four new Bayou Hedge Funds. Each of these four hedge funds subsequently sustained millions of dollars in losses, which the Bayou Entities continued to attempt to conceal through the dissemination of false investment performance reports and false financial statements.

18. In addition, the Bayou Hedge Funds were depleted for the personal financial benefit of the principals of the Bayou Entities. The Bayou Hedge Funds adopted an investment strategy predicated on large numbers of trades involving large amounts of money. This investment strategy was designed to generate a high volume of commissions for Israel's wholly-owned broker-dealer, Bayou Securities, which executed most of these trades. Bayou Securities was paid tens of millions of dollars in trading commissions, which Israel kept for

himself and other principals of the Bayou Hedge Funds to the detriment of the investors in the Bayou Hedge Funds.

19. In 2004, the Bayou Entities attempted to recoup their losses by conducting private placement transactions in the United States and Europe. This action was not disclosed to investors. Instead, the Bayou Entities falsely communicated to investors that trading was still being conducted.

20. The Bayou Entities made a series of bank transfers moving in excess of $100 million out of the Bayou Entities' accounts to various bank accounts in Europe. That money was eventually deposited to a bank account in the United States, which was subsequently seized by the Arizona Attorney General in May 2005 in connection with a forfeiture action commenced in Arizona state court. After the Federal Bureau of Investigation submitted facts sufficient to demonstrate that the seized funds belong to investor creditors of the Bayou Entities, the Arizona Superior Court issued an order directing the transfer of the seized funds to the United States Marshals Service. On October 19, 2006, $106,541,628.64 was transferred from the State of Arizona to the United States Marshals Service. According to the civil forfeiture complaint filed in this District by the United States Attorney for the Southern District of New York, the government will request that these seized funds and any other forfeited property be distributed *pro rata* to victims of the fraud perpetrated by the Bayou Entities.

21. Over the course of their fraudulent existence, the Bayou Entities induced investments of a reported $450 million into the Bayou Hedge Funds and their off-shore counterparts. (The off-shore Bayou funds are the subject of liquidation proceedings under the laws of the Cayman Islands.)

22.     In 2005, the Bayou Entities' Ponzi scheme finally collapsed.  In a letter dated July 27, 2005, the Bayou Entities abruptly advised their investor creditors that the Bayou Hedge Funds were voluntarily liquidating.  All investor creditors were promised a 100% redemption of their investments, which purportedly had grown in value, upon completion of a final audit.  In mid-August 2005, the Bayou Entities sent another letter promising all investor creditors that 90% of the total value of their investments would be distributed within one week.

23.     Despite this assurance, the Bayou Entities did not repay any additional money to investor creditors.  Instead, the remaining investor funds under the Bayou Entities' control vanished in a final act of deception and fraud.  Hundreds of investor creditors were left without any repayment of their investment principal.  On information and belief, the Bayou Entities' creditors lost approximately $250 million in total.

### **The Bayou Entities' Fraudulent Redemption Payments to Investors**

24.     Prior to August 2005, and during the period of the Bayou Entities' fraudulent financial scheme, various Bayou investors, including Redwood, sought to, and did, redeem all or part of their investment in the Bayou Hedge Funds (the "Redeeming Investors").  At the time, the Bayou Hedge Funds' falsified financial statements reported that the Redeeming Investors' accounts included substantial gains on their investments.  In reality, the Bayou Hedge Funds had lost a substantial portion of investors' principal and had not made any profits.  A true statement of the Redeeming Investors' accounts would have shown an amount significantly less than the Redeeming Investors' principal contributions and of course no profits.

25. In an attempt to conceal the ongoing fraud and thereby hinder, delay, or defraud other current and prospective investors, the Bayou Entities paid the Redeeming Investors the inflated amount reflected in the falsified financial statements, including non-existent principal and fictitious profits, not the Redeeming Investors' true depleted account balances.

26. Due to heavy trading losses and the siphoning of additional funds, the Bayou Entities did not have the funds to pay these redemptions of non-existent principal and fictitious profits to the Redeeming Investors. Accordingly, the Bayou Entities aggressively pursued new investors, and used the incoming capital from those new investors to continue operations and pay redemption proceeds to investors who sought to exit the Bayou Hedge Funds. The Bayou Entities were able to stay afloat only by using the principal invested by new clients to pay the Redeeming Investors. In this way, the Bayou Entities operated as a "Ponzi" scheme.

27. At the time the Redeeming Investors redeemed their investments in the Bayou Entities, they knew or should have known that the Bayou Entities were fraudulent and insolvent, and that the redemption payments were made in furtherance of a fraud. Upon information and belief, many of the Redeeming Investors were "tipped" by investment advisors or others to withdraw their investments from the Bayou Entities. In addition, there were a number of red flags that did or should have put the Redeeming Investors on actual or inquiry notice of the Bayou Entities' fraud and/or insolvency.

### The Fraudulent Transfers to Defendant

28. On or about September 6, 2000, Redwood invested $500,000 to acquire certain participation interests in the Bayou Fund (the "First Investment").

29. On or about November 8, 2000, Redwood invested an additional $500,000 to acquire certain participation interests in the Bayou Fund (the "Second Investment").

30. On or about March 5, 2001, Redwood invested an additional $750,000 to acquire certain participation interests in the Bayou Fund (the "Third Investment").

31. In or about December 2001, Redwood requested withdrawal of $800,000 from the Bayou Fund.

32. On or about January 3, 2002, the Bayou Fund made a transfer of its property in the amount of $800,000 to or for the benefit of Redwood (the "First Partial Withdrawal").

33. On or about December 1, 2002, Redwood invested an additional $500,000 to acquire certain participation interests in the Bayou Fund (the "Fourth Investment," and together with the First Investment, Second Investment, and Third Investment, and minus the First Partial Withdrawal, the "Bayou Fund Investment").

34. On or about February 6, 2003, the Bayou Fund was terminated during a corporate restructuring and the Bayou Fund Investment was transferred to Bayou Accredited.

35. In or about March, 2004, Redwood requested withdrawal of $250,000 from Bayou Accredited.

36. On or about April 1, 2004, Bayou Accredited made a transfer of its property in the amount of $250,000 to or for the benefit of Redwood (the "Second Partial Withdrawal," and subtracted from the Bayou Fund Investment, the "Investment").

37. In or about June or July, 2004, Redwood requested full redemption and withdrawal of all of its participation interests in Bayou Accredited.

38. On or about August 13, 2004, Bayou Accredited made a transfer of its property in the amount of $1,667,300 to or for the benefit of Redwood (the "First Fraudulent Transfer").

39. The First Fraudulent Transfer included an amount equal to the Investment and $467,300 in fictitious profits ("Fictitious Profits").

40. On or about June 14, 2005, Bayou Accredited made a transfer of its property in the amount of $199,202 to or for the benefit of Redwood (the "Second Fraudulent Transfer," and together with the First Fraudulent Transfer, the "Fraudulent Transfers").

41. The Second Fraudulent Transfer included $199,202 in Fictitious Profits.

### First Claim for Relief

**(Action to Avoid and Recover Intentionally Fraudulent Transfers of Money and Other Property and Preserve Same for the Benefit of the Estate Pursuant to Bankruptcy Code §§ 548(a)(1)(A), 550(a), 551, and 1107)**

42. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 41 above as if fully set forth herein at length.

43. The Fraudulent Transfers were made by Plaintiff with the actual intent to hinder, delay, or defraud the creditors of the Bayou Entities. Plaintiff made the Fraudulent Transfers to or for the benefit of the Defendant in furtherance of a fraudulent investment scheme.

44. The Defendant cannot satisfy its burden of establishing that it took either Fraudulent Transfer for value and in good faith.

45. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(A), 550(a), and 551: (a) avoiding and preserving the Fraudulent Transfers, (b) directing that the Fraudulent Transfers be set aside, and (c) recovering such Fraudulent Transfers from the Defendant for the benefit of the estate of the Debtor.

### Second Claim for Relief

**(Action to Avoid and Recover Constructively Fraudulent Transfers of Money or Other Property and Preserve Same for the Benefit of the Estate Pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a), 551, and 1107)**

46. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 41 above as if fully set forth herein at length.

47. By virtue of the fact that the Bayou Entities operated a fraudulent investment scheme, at all relevant times, Plaintiff: (a) was insolvent on the date that each of the Fraudulent Transfers was made or became insolvent as a result of each of the Fraudulent Transfers, and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with the Debtor after each of the Fraudulent Transfers was effectuated constituted unreasonably small capital, and/or (c) at the time of each of the Fraudulent Transfers, intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

48. Plaintiff received less than a reasonably equivalent value in exchange for the Second Fraudulent Transfer and for the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits.

49. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a) and 551: (a) avoiding and preserving the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits, (b) directing that the Fraudulent Transfers be set aside to the extent they constituted payment of Fictitious Profits, and (c) recovering the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits from the Defendant for the benefit of the estate of the Debtor.

### Third Claim for Relief

**(Action to Avoid Intentionally Fraudulent Transfers of Money and Other Property and Preserve Same for the Benefit of the Estate Pursuant to New York Debtor and Creditor Law §§ 276, 276-a, and 278, and Bankruptcy Code §§ 544, 550(a), 551, and 1107)**

50. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 41 above as if fully set forth herein at length.

51. At all relevant times, there was and is at least one or more creditors who held and hold unsecured claims against Plaintiff that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

52. The Fraudulent Transfers were made by Plaintiff with the actual intent to hinder, delay, or defraud the creditors of the Bayou Entities. Plaintiff made the Fraudulent Transfers to or for the benefit of the Defendant in furtherance of a fraudulent investment scheme.

53. As a result of the foregoing, pursuant to New York Debtor and Creditor Law §§ 276, 276-a and 278 and Bankruptcy Code §§ 544(b), 550(a), and 551, Plaintiff is entitled to a judgment: (a) avoiding and preserving the Fraudulent Transfers, (b) directing that the Fraudulent Transfers be set aside, (c) recovering the Fraudulent Transfers from the Defendant for the benefit of the estate of the Debtor, and (d) recovering attorneys' fees from the Defendant.

**Fourth Claim for Relief**

**(Action to Avoid Constructively Fraudulent Transfers of Money and Property and Preserve Same for the Benefit of the Estate Pursuant to New York Debtor and Creditor Law §§ 273 and 278, and Bankruptcy Code §§ 544, 550(a), 551, and 1107)**

54. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 41 above as if fully set forth herein at length.

55. At all relevant times there was and is at least one or more creditors who held and hold unsecured claims against Plaintiff that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

56. Plaintiff did not receive fair consideration for the Second Fraudulent Transfer or for the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits.

57. Plaintiff was insolvent at the time it made each of the Fraudulent Transfers or, in the alternative, Plaintiff became insolvent as a result of each of the Fraudulent Transfers.

58. As a result of the foregoing, Plaintiff is entitled to a judgment pursuant to New York Debtor and Creditor Law §§ 273 and 278 and Bankruptcy Code §§ 544(b), 550 and 551: (a) avoiding and preserving the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits, (b) directing that the Fraudulent Transfers be set aside to the extent they constituted payment of Fictitious Profits, and (c) recovering the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits from the Defendant for the benefit of the estate of the Debtor.

**Fifth Claim for Relief**

**(Action to Avoid Constructively Fraudulent Transfers of Money and Property and Preserve Same for the Benefit of the Estates Pursuant to New York Debtor and Creditor Law §§ 274 and 278, and Bankruptcy Code §§ 544, 550(a), 551, and 1107)**

59. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 41 above as if fully set forth herein at length.

60. At all relevant times there was and is at least one or more creditors who held and hold unsecured claims against Plaintiff that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

61. Plaintiff did not receive fair consideration for the Second Fraudulent Transfer or the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits.

62. At the time Plaintiff made each of the Fraudulent Transfers, Plaintiff was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Fraudulent Transfers was an unreasonably small capital.

63. As a result of the foregoing, pursuant to New York Debtor and Creditor Law §§ 274 and 278 and Bankruptcy Code §§ 544(b), 550(a), and 551, Plaintiff is entitled to a judgment: (a) avoiding and preserving the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits, (b) directing that the Fraudulent Transfers be set aside to the extent they constituted payment of Fictitious Profits, and (c) recovering the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits from the Defendant for the benefit of the estate of the Debtor.

### Sixth Claim for Relief

**(Action to Avoid Constructively Fraudulent Transfers of Money and Property and Preserve Same for the Benefit of the Estate Pursuant to New York Debtor and Creditor Law §§ 275 and 278, and Bankruptcy Code §§ 544, 550(a), 551, and 1107)**

64. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 41 above as if fully set forth herein at length.

65. At all relevant times there was and is at least one or more creditors who held and hold unsecured claims against Plaintiff that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).

66. Plaintiff did not receive fair consideration for the Second Fraudulent Transfer or the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits.

67. At the time Plaintiff made each of the Fraudulent Transfers, Plaintiff had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

68. As a result of the foregoing, pursuant to New York Debtor and Creditor Law §§ 275 and 278 and Bankruptcy Code §§ 544(b), 550(a), and 551, Plaintiff is entitled to a judgment: (a) avoiding and preserving the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits, (b) directing that the Fraudulent Transfers be set aside to the extent they constituted payment of Fictitious Profits, and (c) recovering the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits from the Defendant for the benefit of the estate of the Debtor.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Defendant as follows:

i. On the First Claim for Relief, pursuant to Bankruptcy Code §§ 548(a)(1)(A), 550(a), 551, and 1107: (a) avoiding and preserving the Fraudulent Transfers, (b) directing that the Fraudulent Transfers be set aside, and (c) recovering the Fraudulent Transfers from the Defendant for the benefit of the estate of the Debtor;

ii. On the Second Claim for Relief, pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a), 551, and 1107: (a) avoiding and preserving the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits, (b) directing that the Fraudulent Transfers be set aside to the extent they constituted payment of Fictitious Profits, and (c) recovering the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits from the Defendant for the benefit of the estate of the Debtor;

iii. On the Third Claim for Relief, pursuant to New York Debtor & Creditor Law §§ 276, 276-a, and 278 and Bankruptcy Code §§ 544(b), 550(a), 551, and 1107: (a) avoiding and preserving the Fraudulent Transfers, (b) directing that the Fraudulent Transfers be set aside, (c) recovering the Fraudulent Transfers from the Defendant for the benefit of the estate of the Debtor, and (d) recovering attorneys' fees from the Defendant;

iv. On the Fourth Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 273 and 278 and Bankruptcy Code §§ 544(b), 550, 551, and 1107: (a) avoiding and preserving the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits, (b) directing that the Fraudulent Transfers be set aside to the extent they constituted payment of Fictitious Profits, and (c) recovering the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits from the Defendant for the benefit of the estate of the Debtor;

v. On the Fifth Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 274 and 278 and Bankruptcy Code §§ 544(b), 550, 551, and 1107: (a) avoiding and preserving the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits, (b) directing that the Fraudulent Transfers be set aside to the extent they constituted payment of Fictitious Profits, and (c) recovering the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits from the Defendant for the benefit of the estate of the Debtor;

vi. On the Sixth Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 275 and 278 and Bankruptcy Code §§ 544(b), 550, 551, and 1107: (a) avoiding and preserving the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits, (b) directing that the Fraudulent Transfers be set aside

17

to the extent they constituted payment of Fictitious Profits, and (c) recovering the Second Fraudulent Transfer and the portion of the First Fraudulent Transfer constituting payment of Fictitious Profits from the Defendant for the benefit of the estate of the Debtor;

vii. On all Claims for Relief, pursuant to federal common law and Sections 5001 and 5004 of the New York Civil Practice Law and Rules, awarding Plaintiff prejudgment interest from the date on which the Fraudulent Transfers were received;

viii. Awarding Plaintiff all applicable interest, costs, and disbursements of this action;

ix. Pursuant to Bankruptcy Code § 502(d), disallowing any and all claims of the Defendant unless the Defendant has repaid the Fraudulent Transfers to the estate of the Debtor; and

x. Granting Plaintiff such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: New York, New York
October 27, 2006

DECHERT LLP

By: /s/ Gary J. Mennitt
H. Jeffrey Schwartz (HJS-4105)
Gary J. Mennitt (GM-1141)
Elise Scherr Frejka (ESF-6896)
Jonathan D. Perry (JP-0863)
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Attorneys for the Debtors and
Debtors-in-Possession*